IRIS KAY STEVENSON et al., by CHARLES R. STEVENSON, as next best friend, appellees, v. KENNETH MCMILLAN, appellant.

No. 49564.

(Reported in 95 N.W2d 719)

APRIL 8, 1959.

Life & Davis, of Oskaloosa, for appellant.

Gilbert & Stoddard, of Oskaloosa, for appellees.

PETERSON, J.—Mr. and Mrs. Charles R. Stevenson were married in 1944. Both had previously been married and divorced. Mr. Stevenson had no children by his first marriage. Mrs. Stevenson had four daughters. She brought them into the Stevenson home. Mr. and Mrs. Stevenson had three daughters after the marriage: Iris, now 13; Elizabeth, now 12; and Rosalie, now 8. Their custody is involved in this action. Mr. Stevenson

was the owner of a farm of 91 acres located about 4½ miles from New Sharon. The parties lived together for ten years.

The oldest daughter by the first marriage left home before Mrs. Stevenson left. Mrs. Stevenson and the other three daughters by the first marriage and all three daughters by the second marriage left the farm early in 1954. She sued her husband for divorce, charging cruel and inhuman treatment. The case was tried on November 8, 1954, and Mrs. Stevenson was granted a divorce and custody of the three daughters. She was granted $1000 as permanent alimony, payable in installments over a three-year period, and $45 per month support money for the three daughters. There was an agreed division of household goods, cattle and other personal effects.

Mrs. Stevenson soon discovered that it was impossible for her to work and earn enough, even including the support money, to care for her daughters and provide a housekeeper while working. She asked her brother, defendant herein, and his wife if they would take the girls into their home and care for them. Mr. and Mrs. McMillan agreed to do so. The two younger girls came into the McMillan home in the latter part of December 1954 and the first part of January 1955. Iris came into the home in about May of 1955. They have, therefore, been cared for by the McMillans for four years. Mr. Stevenson has paid the support money of $45 per month. Above that figure all food, clothing and miscellaneous expenses have been paid by defendant.

Mr. Stevenson did not demand the children from defendant, but started this habeas corpus action for their custody. The trial court decided in his favor and defendant has appealed.

At the close of the evidence appellant's counsel moved for dismissal on the ground that habeas corpus was not the proper forum. He alleged the question should be settled in the divorce case where the court retained jurisdiction of the children and should be in the nature of an application for modification of decree. The trial court overruled the motion. This ruling was correct because the only manner in which the question of the best interest of the children can be settled, in view of the fact that they are in the possession of their uncle and aunt, is through a habeas corpus proceeding.

I. Each case of this type turns almost exclusively on the facts of the case. In custody cases they are sometimes somewhat similar, but never identical. However, there are certain well-established principles which control the cases. We will mention some of the general principles.

Habeas corpus cases of this nature are triable de novo. We have so held in several recent cases. Barnett v. Blakley, 202 Iowa 1, 209 N.W. 412; Jensen v. Sorenson, 211 Iowa 354, 233 N.W. 717; Barry v. Reeves, 203 Iowa 1345, 214 N.W. 519; Ellison v. Platts, 226 Iowa 1211, 286 N.W. 413; Allender v. Selders, 227 Iowa 1324, 291 N.W. 176; Finken v. Porter, 246 Iowa 1345, 72 N.W.2d 445.

On question of custody of minors a presumption exists in favor of natural parent or parents. However, the presumption is rebuttable, depending on the welfare of the child. Risting v. Sparboe, 179 Iowa 1133, 162 N. W. 592, L. R. A. 1917E 318; Finken v. Porter, supra.

More important than the above principles, and as a primary consideration in child-custody cases, is the welfare of the child. Risting v. Sparboe, supra; Joiner v. Knieriem, 243 Iowa 470, 52 N.W.2d 21; Durst v. Roach, 245 Iowa 342, 62 N.W.2d 159; Herr v. Lazor, 238 Iowa 518, 28 N.W.2d 11; Smidt v. Benenga, 140 Iowa 399, 118 N.W. 439; Ellison v. Platts, supra; Scheffers v. Scheffers, 242 Iowa 563, 47 N.W.2d 157; Paintin v. Paintin, 241 Iowa 411, 41 N.W.2d 27, 16 A. L. R.2d 659, and citations; Freese v. Freese, 237 Iowa 451, 22 N.W.2d 242; Rust v. Trapp (Iowa, N.O.R.) 201 N.W. 565; Jensen v. Sorenson, supra.

II. We will analyze the facts of the case as to the people involved, the homes of the parties, and what the future might hold for the three children in the respective homes. Our information is curtailed somewhat by the rulings of the trial court in excluding some pertinent evidence about the father. The trial court rejected any evidence as to his general character, temperament and disposition. Defendant's counsel proffered testimony as to the vicious character of the father and his mistreatment of his stepdaughters in various respects. The proffer contained an offer of evidence as to an alleged attack upon the oldest stepdaughter, forcing her to go out into the

world at sixteen, causing her to be declared a delinquent, and being sent to a Juvenile Home until she was eighteen. The matter of seducing her came up incidentally in the evidence. The father denied it.

While the court was right in saying the divorce case should not be retried, yet we feel it would have been of value, both to the trial court and this court, if some evidence, within reason, had been admitted concerning the character, actions and disposition of the father.

Mr. Stevenson is sixty-six years of age. He owns the farm of ninety-one acres, clear of incumbrance. He has recently modernized his house. He has three goats, sixteen cattle and about seventy-five chickens on the farm.

For many years he worked for the Rollscreen Company of Pella. He retired in January of 1958 when he was sixty-five years of age. He now receives $25 per month pension from the company. He receives $91 per month from social security. He also filed for social security for his three children and was allotted $108.20 per month. However, he has only paid Mr. McMillan $45 per month in accordance with the decree in the divorce case. The other $63.20 he has appropriated to himself. He never paid defendant anything out of it to help maintain his three children. He did not allocate it for the benefit of the children in the form of a trust fund for college education or for the girls in later years when one or more of them might become married. He has $600 in the bank, but that account is in his own name.

From the record it appears Mr. Stevenson is peculiar as to food matters. He contends that cow's milk is not good for human consumption. It may lead to mastitis. He drinks goat's milk and takes the position that this is what should be used for human milk food. He contends sugar as refined by modern processes is not good; that honey should be used for sweetening. To move teen-age girls into a peculiar food situation such as this is not wholesome.

No neighbors nor friends came forward in the case to testify on behalf of the father. The only evidence pertaining to the issues of the case is his testimony. He did call Mrs. Hartung

as a witness. She is his housekeeper, but had only been such for three weeks and knew nothing about the fundamental facts of the case.

The most important situation bearing upon the question of where custody should be placed is the grievous neglect by the father of these children for the past four years. Under the divorce decree he was given the right to take the children to his home for two months each summer. Four summers have passed and he has never availed himself of this opportunity of having his children with him, becoming better acquainted, and showing them some love and attention.

He was granted the privilege of visiting the children every other Sunday and the right to take them out on Sunday afternoon. During these four years he has only visited them two or three times a year; in 1957 three times; in 1958 two times; he never took them out; not even for an automobile ride.

He has never paid the slightest attention to their birthdays. He has sent them no presents; not even a birthday card. The first year after the divorce and before the children came to Mc-Millans, he testified that he brought some Christmas presents to them. He states that somebody put the presents back into his car. He does not know who it was. Since they have been at the McMillans he has only remembered them two times at Christmas. The only manner in which he has remembered them is that he gave each of them $1 on these two occasions.

In May of 1954, which was prior to the divorce, Iris wrote him a nice letter. In December 1954 Elizabeth sent him a nice Christmas card. There is nothing in the record showing that he answered these two communications from his daughters and during all of the four years he has never written them or sent them any letters or cards of any nature. As the old adage goes: "Actions speak louder than words."

We are also confronted with the fact of the father's age. He is fifty-eight years older than his youngest daughter. When she is twenty-one he will be seventy-nine. Outside of housekeepers, which usually come and go, he will be there alone with the three girls. The variance in the ages is such that there can be no companionship for young, wholesome and healthy girls. We considered this question in Allender v. Selders, supra, where we

said at pages 1333, 1334 of 227 Iowa: "The burdens and respon-
sibilities of caring for this boy are going to increase appreciably
in the immediate years to come, and their ability [grandparents]
to meet those burdens and responsibilities is going to progres-
sively decrease."

Outside of a hired housekeeper they would have no feminine
attention or help in these critical years of their life. With the
housekeeper it would be primarily a question of her job. There
would be no connection of relationship and it would be a chance
as to whether or not such help in the home would be kindly and
constructive.

He now wants their custody, but in the face of his callous
treatment, and in the face of not taking advantage of his oppor-
tunities to show consideration and attention to his daughters in
the past, we do not feel his home and his control over them can
possibly be for their welfare through the impressionable teen-
age years as they are maturing into womanhood.

III. Mr. McMillan, the defendant, brother of Mrs. Steven-
son, is forty-four. His wife, the girls' aunt by marriage, is
thirty-six. Their home is about the same as the father's house.
It was five rooms and only partly modern. However, at the time
of the trial the McMillans were adding another room to make
six rooms, in order to properly care for the girls as they are
becoming older, and were modernizing the house.

Mr. McMillan is a construction worker and earns $5500 a
year, so he is amply able to care for all financial responsibilities
in connection with the three girls. He and his wife have ac-
cepted them into their home as a part of the family. They have
the same care and attention as is given to their own little girl,
ten years of age. The girls are healthy and strong and their
grades in school are above average. They attend church and
Sunday school regularly. Iris is a member of the young peo-
ple's club at the church. Mr. McMillan only gets $45 a month
from the father. The court is justified in taking judicial notice
of the fact that the food, clothing and all miscellaneous expenses
of three growing girls, eight, twelve and thirteen years of age
will cost from three to four times this amount in these days of
high cost of living. Mr. McMillan has accepted this responsi-
bility for more than four years and is resisting this case be-

cause he is willing to continue to accept the responsibility for the present and the future. He testified that if he is given the custody of the girls he will not only see that they finish high school, but if any or all of them desire to go to college he will pay all expenses of a college education.

Three neighbors and friends, intimately familiar with the McMillan household, testified on behalf of defendant. They testified that the home was neat and clean; that the children were always nicely and well dressed and that they appeared to be completely happy and contented. The children attend school functions and town functions. Each week in summer there is an outdoor motion-picture exhibit in the town and Mrs. McMillan always takes all four children to this entertainment. The neighbors and friends testified that Mrs. McMillan is a very kindly lady and that the children not only have her care, but her affection.

There is only one blot on Mr. McMillan's record. He was indicted on an OMVI charge. Under oath as a part of his testimony he stated: "I am not guilty." There was no testimony about the matter except as he gave the testimony himself. While this is unfortunate, we do not believe it is sufficient to nullify an otherwise splendid record.

As we look into the future it would be a tragedy to take these three girls away from a home where they have been living for four years, and where the testimony shows they get good care and the affection of Mr. and Mrs. McMillan, and put them out in the country on the farm of the father where it is problematical and uncertain as to whether they would get good and adequate care and also as to whether there would be the daily kindness and affection, so essential to children of that age.

IV. The primary question to be decided in connection with custody is the welfare of the children. We have so held in numerous cases, especially in recent years. Among others this court has made definite statements to that effect in the following cases:

In Rust v. Trapp, supra, we quoted with approval from Knochemus v. King, 193 Iowa 1282, 1287, 188 N.W. 957, 959, as follows: " 'It is the duty of a court to leave the child where its

interests, welfare and happiness will be best subserved.' In making answer to this proposition a court must take into account the home surroundings and the influence of that environment; the character of the individuals who are seeking control and custody; school facilities, sanitary conditions in the home, the ability of the individuals claiming the right of custody to provide food, clothing, and education; and other facts and circumstances bearing on the future welfare of the child in controversy."

In Herr v. Lazor, supra, we said at page 526 of 238 Iowa: "Our holdings—more especially our recent holdings—are based upon the theory that that should be done which is for the best interest of the child; that always, whether the custody is awarded to the parent or another, it is the interest of the minor which the court has in mind."

In Scheffers v. Scheffers, supra, at page 570 of 242 Iowa, we quoted the following statement: " 'When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home, except for the most cogent reasons.' "

In Joiner v. Knieriem, supra (page 480 of 243 Iowa), this court said: "This court, from its early cases to its latest, has held uniformly that the parental rights were secondary, and that the primary and paramount consideration for the guidance of the court was the welfare and best interests of the child." (Twenty-three cases cited.)

In Durst v. Roach, supra (page 344 of 245 Iowa), this court said: "As we have stated in the cases cited above, and in numerous other cases where the custody of a little child is the issue, the primary and paramount consideration for the guidance of the court is the welfare of the child. We have held that the child's welfare is superior to the claim of either parent, and that the feelings and wishes of the parent are entitled to but little, if any, consideration."

In the comparatively recent case of Finken v. Porter, supra, we said (page 1348 of 246 Iowa): "In cases of this kind the primary concern of courts is the welfare and best interests of the child." In this case (page 1353) we quoted with approval from 27 Am. Jur., Infants, section 108, as follows: " 'As in the

case of controversy between father and mother, so even as between the father and the parents or other relatives of the mother of a child, the courts have not hesitated to deprive the father of his natural right of custody where the health and well-being of the child have seemed to demand such a course.' "

V. We will refer to a few cases where the custody was not granted to a parent.

In Risting v. Sparboe, supra, the court decided against the father and in favor of an aunt and uncle. The mother of the little child, Selma, who was about four years old, had departed this life. The mother was sick and came down to Iowa from Minnesota to see a sister who was a physician. She died at this sister's house. The sister took little Selma to another sister, Mrs. Sparboe, and left her. She was in the Sparboe home for over two years when the father commenced this habeas corpus proceeding. He really did not desire to take the child into his own home, but wanted to take her to Minnesota to the home of another sister-in-law, which was closer to his home. However, the court held it was for the best interest of the child that she be left with the aunt and uncle, who had a nice home, and who had given her splendid care for two or three years.

Jensen v. Sorenson, supra, has some striking similarities to the case at bar. Mr. and Mrs. Jensen were divorced in Wisconsin. They had one child. When the child was nine months old Mrs. Jensen died. Her family home had been in Black Hawk County and after her death she was brought back to Iowa for burial and the baby was also brought back. Mrs. Jensen had asked her sister Mrs. Sorenson to take the child and she did. Plaintiff, the father, had never paid any attention to the child in Wisconsin, although he had the privilege of visitation in the divorce decree. He never came to Iowa to see the child until he came to start this action. At the time of the action the child was about three years of age. He started a habeas corpus proceeding and the trial court granted custody to him as against Mrs. Margaret Sorenson, the aunt of the child. This court reversed, holding that it was for the best interest of the child to remain in the custody of the aunt and her husband, rather than being returned to the father.

In Joiner v. Knieriem, supra, the court decided the custody question against the father and in favor of grandparents. Mrs. Joiner secured a divorce from her husband in October 1947. They had a little girl, Gloria Jean, four years old whose custody was granted to the mother. The mother had gone to the home of her parents and lived there until Thanksgiving day in 1949, when she died. In the meantime the father had remarried a cousin of Mrs. Joiner. The charge was made that Mr. Joiner had paid undue attention to her prior to the divorce. The court decided the case against the father and in favor of the grandparents as being for the best interest of Gloria Jean who was then about eight years old and had been in their home for three or four years.

The case of Durst v. Roach, supra, was decided against the father and in favor of the paternal grandmother and step-grandfather. The little daughter, Vickie, was about six years old at the time of the trial. The father had been married three times. Two or three years before the trial Mrs. Roach, Mr. Durst's mother, married Dale Roach, a farmer living in Page County. His wife had died and he had three children. His financial situation was substantial. Taking into consideration the disposition and the actions of the father and the fact that his mother had taken care of Vickie for several years, the court held it was to Vickie's best interest that the custody be left with her grandmother, Mrs. Roach.

The decree of the trial court is reversed, and the writ is annulled.—Reversed.

All Justices concur.