JAMES BRENT KOURIS, by ILO WYNN, his next friend, appellant, v. VERNA LUNN, appellee.

No. 51743.

(Reported in 136 N.W.2d 502)

JULY 29, 1965.

C. M. Manly, of Grinnell, and Gamble, Read, Riepe, Martin & Webster, of Des Moines, for appellant.

Bray, McCoy & Faulkner, of Oskaloosa, for appellee.

PETERSON, J.—This is a habeas corpus action involving the custody of a small child named James Brent Kouris (known as Jimmie). He is the son of Roselyn Kay Kouris (known as Kay) and the question is whether Kay, the mother, Ilo Wynn, the grandmother, or Verna Lunn, his great-aunt, should have custody.

I. Kay was first married when she was 14 years of age. She had a little boy soon after marriage but she assigned all interest in that boy to her husband when they were divorced, sometime after the birth of the child. She then remarried in

1960 to a man by the name of George Kouris. After Jimmie was born she and her mother cared for him until January 1964. The name of Kay's mother and Jimmie's grandmother was Ilo Wynn. She lived in Des Moines and held a very responsible position.

In January 1964 Kay telephoned her mother and said she was not able to make enough to properly feed and clothe Jimmie and she first asked her mother if she would come and get him. There was some discussion about the matter and finally Mrs. Wynn suggested they get Jimmie and take him to the home of Mrs. Wynn's sister whose name was Verna Lunn.

Mrs. Wynn and Mrs. Lunn went to Davenport to get Jimmie. Kay was working in a bar in said city and living in rooms up over the bar. They secured Jimmie, and also took with them in the car his baby crib, clothing and toys.

He was taken to the home of Mrs. Lunn at Grinnell, Iowa. It was a comparatively new and completely modern home. When Mrs. Lunn secured him he was weak and emaciated. His clothing was very meager. Mrs. Lunn bought him a rather large quantity of new clothing and proceeded to feed him and care for him in proper manner. He progressed splendidly and increased five or six pounds in the next six months.

In about May of 1964, when Jimmie was two years of age, Kay decided she wanted him back. An investigation was made as to Kay's behavior and mode of life. It was determined from such investigation that her behavior was bad. It was so bad that her mother decided she would not approve the change of custody from Mrs. Lunn to Kay. However, the grandmother decided that she wanted to take Jimmie herself, and care for him and rear him.

Mrs. Wynn and Kay went to Grinnell to the home of Mrs. Lunn and demanded the custody of Jimmie. Mrs. Lunn refused to surrender such custody. She said that she had cared for him and fed him now for many months and that he was healthy and strong and was very happy in her home. The result was the habeas corpus proceeding with which we are now confronted.

We can very quickly dispose of the claim of Kay, the mother. It was established by great weight of the evidence and through the testimony of several witnesses that she was not a

proper and fit person to have the little boy in her custody. Her mother testified she should not have Jimmie as she had a criminal record.

The controversy therefore before the trial court, and in this court, becomes one as between Ilo Wynn, the grandmother of Jimmie, and Verna Lunn, his great-aunt.

Mrs. Wynn was a very able and experienced person. She was unmarried at the time of this controversy, having been married three times. At the time of trial she was 46 years of age. She held a responsible position with the Firestone Tire Company earning $150 per week. She was the secretary of the company union composed of about 2000 members. She had been elected to said position by her fellow workers. She had been living for some time in an apartment house where there was only one room. In preparation for this trial and for securing Jimmie, if she could get his custody, she rented a larger apartment consisting of four rooms, completely modern and located in a good part of the city of Des Moines. Her record, however, was not clear. As above stated, she had been married three times and was now single. She was keeping very close company with a gentleman who stayed at her home frequently until late in the evening and with whom she sometimes traveled to other places. Her sister asked her why she did not marry Mr. McMahan and her answer was "I like it better this way". She is a member of a church, but never attends, although she testified she would go to church and would take Jimmie to Sunday school if she secured his custody. She had arranged for a baby-sitter to take care of him during the time she was at work for eight hours each day. There is no question but what she loved her little grandson, who is now three years of age, and no doubt she would take good care of him, but the conditions in her home are not conducive to his welfare.

Verna Lunn lives in the city of Grinnell. She is a registered nurse and has been working more or less since 1927 at a hospital in Grinnell. She usually works three days a week. Verna was married and divorced many years ago. She has one daughter from such marriage. She married Mr. Lunn many years ago and lived with him until his death, which occurred about six months ago. She had two children from this marriage. Both children

are grown and she is living alone in her comparatively new modern home. She has a baby-sitter for Jimmie when she is at work. The baby-sitter is a neighbor, having several children of her own, and she takes care of Jimmie and he plays with her children while Verna is away. In addition to her home Verna also has a car, $15,000 in savings account in the bank, and about $900 in checking account. The evidence discloses no blot against her character. She is highly respected and well known in her city and community.

█ It is axiomatic and we have stated dozens of times that the first consideration with reference to the custody of a minor child is the welfare of the child. We will make only a few citations. Rule 344(f)15, Rules of Civil Procedure; Carrere v. Prunty, 257 Iowa 525, 133 N.W.2d 692; Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 121 N.W.2d 216; Ball v. Ball, 250 Iowa 763, 765, 96 N.W.2d 317; Stillmunkes v. Stillmunkes, 245 Iowa 1082, 1085, 65 N.W.2d 366, and citations.

II. It is impossible to find two custody-of-children cases exactly similar. The state of facts in each case has some condition or circumstance which is peculiar unto itself. This is true as to the case at bar. We find no other case which can be a completely similar precedent. However, certain principles with reference to our position through the years concerning the matter of custody of children have been established and it is of value in the instant case that we consider a few of such principles. Herr v. Lazor, 238 Iowa 518, 28 N.W.2d 11; Vanden Heuvel v. Vanden Heuvel, supra.

█ III. While the law raises a presumption that a minor child's welfare will be best served in the care and custody of a parent, the presumption is rebuttable, depending on the welfare of the child. Stevenson v. McMillan, 250 Iowa 737, 95 N.W.2d 719; Finken v. Porter, 246 Iowa 1345, 72 N.W.2d 445; Durst v. Roach, 245 Iowa 342, 62 N.W.2d 159; In re Guardianship of Plucar, 247 Iowa 394, 72 N.W.2d 455.

It is somewhat tragic that the habits of a young mother, only 25 years of age, preclude her from the satisfaction and joy of caring for and rearing her child. However, Kay's habits of

life and methods of procedure are such that she·has completely forfeited any right to the custody of Jimmie.

In the case of Stevenson v. McMillan, supra, we held it was not for the best interest of the children that they be returned to their father, living on a farm after the death of the mother, and after they had been cared for four years by an aunt and uncle.

In Finken v. Porter, supra, the father of a small child had an affair with the wife of a neighboring farmer. He was also in the service for some years during the Korean War and failed ·to make any payments toward the care and keep of the child. The child's maternal grandparents had taken care of her for some years and we decided it was for the best interest of the child not to return her custody to the father who was divorced from the child's mother, and had remarried.

The case of Ellison v. Platts, 226 Iowa 1211, 286 N.W. 413, involved the custody of a 20-month-old child. She had been cared for by an aunt and uncle. The mother had lived in the home for a time, but left the home. After observation of the witnesses by the trial court and consideration of the facts of the case the court held the mother was not capable of giving the child a proper home and that it would be for the best interest of the child that she be left with her aunt and uncle. We affirmed.

In Durst v. Roach, supra, the small child had been for a considerable time in the custody of the paternal grandparents. The testimony showed that the father had been married three times and that he had not paid any support for the child to its grandparents while they cared for the child. The court found the grandparents to be capable, substantial and respectable people and held it was for the best interest of the child that she stay with her grandparents.

IV. In a contest for the custody of a child the character and circumstances of the person to whom custody is to be awarded is of extreme importance and should be given careful consideration in comparison with the situation of any other person or relative who is demanding such custody. Herr v. Lazor, 238 Iowa 518, 28 N.W.2d 11; Lursen v. Henrichs, 239 Iowa 1009, 33 N.W.2d 383.

In Herr v. Lazor, supra, at page 525, we said: "In the

selection by the court of a person to care for a small child there are various considerations: first, the ability to give the proper care; and another and most important, is the character of a person to whom the custody is to be assigned. Both the physical welfare and the future moral welfare of the child are important. So, in consideration of a question of the kind we have in this case, it is proper for the court to consider carefully all testimony which may bear upon the custodian's character and the introduction of testimony as to specific matters could not be otherwise than proper."

 The home of Verna Lunn and her situation and the conditions of her family at this time are conducive to the welfare and rearing of Jimmie. There is only one factor involved in the situation which should be given consideration. She is 57 years of age. This is a little old for Jimmie when we consider his age of three years. By the time he is through high school she will be about 70 years of age. However, this is the only factor we can consider as being contrary to her situation. She has good health and works part time as a registered nurse at a hospital. She has a car for transportation at any and all times and she has sufficient means for any emergency that might arise in the form of her $15,000 time certificate and her bank account of $900. She has always given and no doubt will continue to provide all the food and clothing which Jimmie needs for proper comfort and development. Her family history is good. She was married to Mr. Lunn for many years and only lost him through death a few months ago. Her three children are grown and self-supporting and she is at home alone with the exception now of such companionship as she may secure and receive from Jimmie.

While Ilo Wynn is a good woman and is able and experienced and holds a very responsible and important position, yet she has been married three times and has no husband now. She has a constant boyfriend and there is some evidence, not conclusive, that her relations with him are not at all times as they should be.

In view of Kay's situation the only alternative we have is the same one as confronted the trial court. The court properly held that Jimmie would have a better chance in life and would

1274

have a better rearing with his Aunt Verna than with his grandmother.

■ We have decided in the past that when a child is placed in a home where it receives good treatment and moral training it should not be removed from such home except for the most cogent reasons. Thein v. Squires, 250 Iowa 1149, 97 N.W.2d 156.

V. Kay and her mother, Ilo, asked Mrs. Lunn if she would take care of Jimmie. There is some conflict in the evidence, but it would seem that there was not too much conversation at the time Mrs. Lunn willingly accepted Jimmie as to the matter of temporary or permanent custody. Now it appears that for reasons which are not too good nor compelling, Ilo wants Jimmie. After being settled for about six months nicely and comfortably in Verna's modern home and apparently being happy, contented and healthy it would be a mistake, in our judgment, to take him away from that home.

■ VI. There has been some consideration and some discussion pro and con with reference to the matter of the authority of the court in habeas corpus proceedings as to the right of visitation. We have considered custody matters in equity and we are constrained to hold now that we have proper authority to fix a visitation program where it is desirable and needed. We hold that Roselyn Kay Kouris, Jimmie's mother, and Ilo Wynn, Jimmie's grandmother, may visit him, if either or both desire to do so, on the last Sunday afternoon of each month for a period of three to four hours. It may not be necessary, but we caution Mrs. Lunn to receive them cordially and with kindness and not to interfere in any manner with their visitation with Jimmie.

The writ of habeas corpus is—Annulled.

(The foregoing opinion by JUSTICE PETERSON before he retired from the court on July 1, 1965, is adopted as the opinion of the court.)

GARFIELD, C. J., and HAYS, LARSON, SNELL and STUART, JJ., concur.

MOORE and THORNTON, JJ., dissent.

MOORE, J.—I respectfully and most sincerely dissent. The

majority opinion ignores well established legal propositions and fails to consider many important facts which are in the record.

Our first and governing consideration in this habeas corpus case involving the custody of James Brent Kouris, born May 27, 1962, is his welfare and best interest. No citation of authority is needed. See Rule of Civil Procedure 344(f)15.

Defendant's first and governing consideration should be the same but she alleges in her answer the child is illegitimate. She pursued this attack at the trial with no competent evidence. To this she added a most vicious attempt of character assassination against her sister, Ilo Wynn. Such attempt failed. It demonstrates defendant's attitude to win at any cost.

The majority opinion is unfair and unsound in several respects. It mentions Ilo Wynn, the grandmother, had been married three times. Thus indicating she had three husbands. She divorced and then remarried her first husband. He is the father of her three children. Her second marriage was unsatisfactory and lasted only two years. Her children were still young. With such a load she not only worked but cared for her family. For 12 years before the trial she worked at the Firestone tire plant in Des Moines.

The statement in the majority opinion that she is a good woman is amply supported by the record. Her fellow workers so testified. The 2000 union members at the plant elected her secretary of the organization. Her good reputation is well established among her friends and fellow workers. No one casts any reflection upon her or the unmarried man with whom she keeps company. Apparently the majority thinks 46-year-old grandmothers should take to their rocking chair. There is no evidence of any misconduct on Ilo's part except defendant's testimony that Ilo made certain admissions. These are denied by her.

Her brother, James Cooper, testified: "I think Mrs. Wynn would make a good mother. I don't know why she wouldn't make a good mother as any you know. I don't know anything detrimental about Mrs. Wynn." Another brother, Richard, testified: "My sister, Mrs. Wynn, so far she has been just as nice a sister you could have, as far as that goes. I am not classifying her

down in the dumps or anything else. I think she should make a good mother to the child."

Defendant and some other members of the family testified Ilo had made admissions concerning immoral conduct during 1950 or 1951. Such statements were denied by Ilo. The majority opinion gives no weight to this charge against Ilo. With this I agree but it again shows defendant's attitude. Ilo and defendant were friends before this controversy arose.

The grandmother paid the expenses incident to Jimmie's birth. She continued to help financially and was in close contact with the child at all times. Ilo took Jimmie to visit the relatives on many occasions. Without such visits defendant had no contacts with the child until January 1964. When the mother found she was unable to care for Jimmie she called Ilo. The grandmother immediately made the trip to Davenport. While Jimmie was in defendant's home the grandmother visited him almost every weekend. She bought him clothing and toys. She testified she offered to pay defendant for Jimmie's care. On one occasion she took Jimmie from defendant's home in Grinnell to see a circus in Des Moines. The grandmother has shown real love of Jimmie. This is undenied.

Defendant during the short time with Jimmie in her home no doubt took good care of him. The two lived alone. Why defendant's second daughter left the home at age 17 and was living alone in Grinnell at trial time was not disclosed. Ilo has a well furnished adequate home prepared and waiting for her grandson. Ilo's age as compared to that of defendant is an important factor.

The majority opinion cites and discusses several custody cases involving natural parents. Kay, Jimmie's mother, is not asking for custody. She requests her child's custody be given to the grandmother. Kay has made mistakes in the past but there is no evidence of improper care of Jimmie. Her request should be considered. She has shown great concern for the welfare of her son.

Though a parent's request that custody be given to a certain person is not controlling or binding upon the court, it nevertheless is regarded as of great weight and entitled to consideration.

Jensen v. Sorenson, 211 Iowa 354, 361, 362, 233 N.W. 717, 721; Lancey v. Shelley, 232 Iowa 178, 186, 2 N.W.2d 781, 785, and citations.

In Rice v. Messingham, 244 Iowa 111, 116, 55 N.W.2d 925, 927, we say: "In balancing the conflicting claims [for custody of a minor child] the natural claims of blood should not be disregarded or lightly cast aside." The majority opinion does violence to this good rule.

The last paragraph of the majority opinion recognizes the necessity of the mother's and grandmother's love and care for Jimmie and attempts to provide visitation rights. No authority for such a provision in a habeas corpus case is cited. In Childers v. Childres, 257 Iowa 1132, 136 N.W.2d 268, we held the issue of visitation not having been decided by the trial court was not properly before us. The majority opinion now holds otherwise. This legal question need not be decided. After what has happened in this case it is almost certain Jimmie will never know his mother and grandmother. This is not doing equity.

I would sustain the writ.

THORNTON, J., joins in this dissent.